CITY OF CAMDEN, A MUNICIPAL CORPORATION, PROSE-CUTOR, v. CIVIL SERVICE COMMISSION OF THE STATE OF NEW JERSEY AND HORACE B. BEIDEMAN, DE-FENDANTS.

Argued May 4, 1937—Decided July 24, 1937.

Before Justices BODINE, HEHER and PERSKIE.

For the prosecutor, *Firmin Michel* and *Edward V. Martino*.

For the defendant, *Meyer L. Sakin*.

The opinion of the court was delivered by

HEHER, J.   The definitive inquiry is whether the position of "Supervisor of Traffic" in the "Bureau of Transportation" of the city of Camden, to which defendant Beideman was appointed on January 3d, 1928, has in fact been abolished by the governing body of the municipality.   The civil service commission resolved it in the negative; and the municipality seeks a review of its overruling action by *certiorari*.

These are the essential facts:   On October 25th, 1923, the municipal governing body adopted an ordinance placing the "Transportation Department   *   *   *   under the direction and authority of the Director of Public Safety," and creating the "offices" of "Transportation Inspector" and "Clerk to Transportation Inspector," and annexing to each the fixed tenure of one year, with annual salaries respectively of $3,000 and $1,600.   On May 17th, 1927, Beideman was "temporarily employed" by the municipality as "Transportation Inspector." Pursuant to the authority conferred by the Civil Service act of 1908 (3 *Comp. Stat.* 1910, *p.* 3795), as amended, whose provisions had been adopted by the municipality, the civil service commission subsequently placed in the competitive class of the classified service the position of "Supervisor of Traffic." Having qualified in a competitive examination conducted by the commission, Beideman was duly appointed to that position;   and he ‚ exercised the functions thereof until April 20th, 1936, when, in virtue of an ordinance adopted by the city's governing body on April 9th, 1936, purporting to abolish "the office of Transportation Inspector in the Transportation Department," his services were terminated.   The municipality concedes that "the duties pertaining to the office of Transportation Inspector and those pertaining to the

office of Supervisor of Traffic were the same" and the insistence is that the ordinance referred to and the subsequent action complained of were dictated by considerations of sound economy, and were not mere pretenses to cloak the deprivation of rights conferred upon Beideman by the Civil Service act, *supra*. The validity of the civil service status asserted by Beideman is not questioned. It is also conceded that the ordinance of April 9th, 1936, was designed to abolish the "position" classified by the civil service commission under the head of "Supervisor of Traffic."

The challenged municipal action is plainly lacking in validity. The need for this supervisory service continued; and the functions and duties of the position were assigned to a patrolman of the uniformed police department, notwithstanding the admitted lack of an adequate personnel to police the municipality. The director of public safety freely conceded that the police department, then and thereafter, was undermanned. It was not of sufficient numerical strength to meet what, in the opinion of the police authorities, was a reasonable standard of safety; and it is to be noted in this connection that, since the appointment of Biedeman to the position in question, thirty-eight patrolmen have been appointed and assigned to the uniformed department.

The activities of the transportation department have in nowise been curtailed. There has been no decrease in the volume of duties and service, nor in the revenue derived therefrom; and the clerk continued to perform the same function as theretofore. This department is one of importance to the well-being of the municipality. While the primary design of this supervisory service was to minimize traffic hazards, and thus to promote the public safety in a major particular, it is also productive of a substantial annual financial yield. Beideman testified (without contradiction) that "the inspection of buses * * * took around ninety per cent." of his time. He also collected the service fees and turned them over to the city's financial officer. His monthly inspections of buses averaged between eight hundred and fifty and eight hundred and sixty; and he had other incidental duties to perform.

The total annual inspection fees so collected ranged between $41,479.90 in 1930 to $31,104.63 in 1935, with managerial expenses varying between $5,025 in 1930 and $4,130 in 1935.

The circumstances are persuasive of a mere colorable abolition. The position remains in existence. We perceive no basis for the conclusion that the transference of the duties of this position to a member of the police department, whose primary obligation was patrol duty, constituted a merger of the two positions for reasons of economy. The "Transportation Department" also continued in existence, without substantial change in the nature or scope of its activities. The clerk's status and duties likewise remained the same. And a patrolman, under that designation, and at the salary paid to him as such (the amount of which does not appear), was given the headship of the department—an anomaly that, in the light of all the circumstances, gives to the proceeding the color and character of an infringement of the civil service rights and privileges guaranteed to Beideman. It is to be observed here that, after he was placed in charge, the patrolman, Kauffman, continued to sign the inspection cards as "Transportation Supervisor." While the practice was later discontinued, it is difficult to resist the conclusion that the action thus taken was influenced by Beideman's demand for recognition of his rights under the Civil Service law. And so, in the exercise of our fact-finding authority, we conclude that, in substance and effect, the position has not been abolished. The challenged action was plainly illusory. The case is ruled by *Nickerson* v. *Board of Commissioners of the City of Wildwood,* 111 *N. J. L.* 169; *Maxwell* v. *Board of Commissioners of the City of Wildwood,* 111 *Id.* 181; *affirmed,* 113 *Id.* 404; *Hunziker* v. *Kent,* 111 *Id.* 565. See, also, *Cahill* v. *Town of West Hoboken,* 90 *Id.* 398; *Newark* v. *Lyons,* 53 *Id.* 632; *Angelo* v. *State Civil Service Commission,* 6 *N. J. Mis. R.* 648; *affirmed,* 105 *N. J. L.* 629; *Carroll* v. *City of Bayonne,* 3 *N. J. Mis. R.* 308; *Womsley* v. *Jersey City,* 61 *N. J. L.* 499.

Although the betterment of the public service is always of prime import, measures so designed must have due regard to

the policy of the civil service law. While public policy does not permit the validity of the abolition of a wholly useless position to be determined by motive, the abrogation or modification of rights and privileges created by that statute in the realization of what is conceived to be a sound municipal economy, as regards either efficiency or cost of function and management, is justifiable only if necessary in the attainment of the primary objective. A less rigorous rule would result in the substantial impairment of the obligation of the Civil Service law. Apart from the necessity of vindicating the individual rights and privileges thereby conferred, the dominance of that outstanding public policy demands the closing of the door to practices that make for evasion.

It is pertinent to observe that the municipality is not without remedy where circumstances demand a revision of salaries, or of rates of pay, or of other service conditions. It is only necessary that such measures be consistent with and not in defiance of the provisions of the Civil Service law.

The judgment of the civil service commission is therefore without legal infirmity.

Upon the oral argument, the parties joined in a prayer that the meritorious question be determined as if the proceedings had been returned on *certiorari*. The writ shall accordingly issue; and, upon the making of the return, judgment of affirmance shall be entered, with costs.