40 N.J. Super. 182 (1956)
122 A.2d 513
THOMAS P. GRECO, PETITIONER-APPELLANT,
v.
KENNETH D. SMITH, DIRECTOR OF THE DEPARTMENT OF PUBLIC WORKS OF THE TOWN OF BELLEVILLE, A MUNICIPAL CORPORATION OF THE STATE OF NEW JERSEY, TOWN OF BELLEVILLE, A MUNICIPAL CORPORATION OF THE STATE OF NEW JERSEY, CIVIL SERVICE COMMISSION OF THE STATE OF NEW JERSEY, AND DEPARTMENT OF CIVIL SERVICE OF THE STATE OF NEW JERSEY, DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued March 12, 1956.
Decided May 2, 1956.
*184 Before Judges GOLDMANN, FREUND and CONFORD.
Mr. Jacob Fox argued the cause for appellant (Messrs Jacob and Martin S. Fox, attorneys and of counsel).
Mr. Lawrence E. Keenan argued the cause for respondents.
The opinion of the court was delivered by GOLDMANN, S.J.A.D.
Petitioner Greco sought reinstatement before defendant Civil Service Commission to his position as building inspector of defendant Town of Belleville, charging that bad faith rather than reasons of economy motivated the discharge. The Commission, after hearing, determined that petitioner had failed to prove bad faith, and affirmatively concluded that economy had been effected by the transfer of his duties as building inspector to the town engineer. Greco appeals from the adverse ruling.
Initially we recognize that upon review we will not upset the action of the Civil Service Commission in the *185 absence of an affirmative showing that it was arbitrary, capricious or unreasonable, or not supported by the evidence (cf. Carls v. Civil Service Commission, 17 N.J. 215, 221 (1955); Falcey v. Civil Service Commission, 16 N.J. 117, 123 (1954)); or where the Commission has disregarded or failed to recognize the legislative policies enunciated in the Civil Service Act, R.S. 11:1-1 et seq., as amended (Rogers v. Department of Civil Service, 17 N.J. 533, 541 (1955)). These principles serve as a guide in our approach to this appeal, but cannot be considered as prohibiting or limiting our complete inquiry into the facts, for only by such investigation can the action of the agency be properly evaluated. This course is plainly envisioned by R.R. 4:88-13, which gives this court the power to review the facts and make independent findings thereon, which power may be exercised to such extent as the interests of justice require. The question here is whether the claim of economy used in terminating petitioner's active services as building inspector of Belleville was a device for circumventing his tenure rights as a civil servant, in violation of R.S. 11:22-38, and as a veteran in violation of N.J.S.A. 38:16-1.
Belleville, which has a commission form of government, adopted the provisions of Subtitle 3 of Title 11 of the Revised Statutes, "Civil Service," in 1945. The position of building inspector was created in 1948 and is in the classified civil service. Plaintiff took the civil service examination for that position in February 1948, and was thereafter, on August 3, 1948, certified by the Civil Service Commission as entitled to appointment. He was not appointed until November 1, 1948, of which more hereafter. He held the position until his discharge. From the time of his appointment until February 21, 1955 the position of building inspector was in the Building Department, Department of Public Affairs, of which Joseph King was Director. On that day the city commission adopted a resolution, introduced by Director King, transferring the Building Department to the Department of Public Works, headed by Director Smith, one of the defendants. Two days later, on February 23, 1955, the *186 intervening day being a holiday, Smith wrote petitioner advising him that his services would be terminated as of March 1, 1955, and that for "reasons of economy" his duties were thereafter to be performed by the Engineering Department, allocated to the Department of Public Works. Although petitioner reported for work on March 1, he was not permitted to perform his duties. After March 1, 1955 his duties were assigned to and performed by the town engineer, Sheehan, who was subject to Director Smith's supervision. Director Smith had on February 23, 1955 designated Sheehan as "acting building inspector" at no additional compensation, effective March 1, 1955. We were informed at the oral argument that Sheehan died in the latter part of 1955 and that the assistant town engineer, one Faust, was then appointed acting building inspector in his place.
A detailing of the factual situation is necessary to our conclusion that petitioner was wrongfully discharged. Greco was a disabled veteran. From the date of his certification in August 1948 to the date of his appointment on November 1, 1948  a period of about three months  the position of building inspector was filled by Campbell McCall, a friend of Director of Public Affairs King, with whom he had allegedly been associated in business. Plaintiff testified that during this period he tried to get information about his appointment, but made no progress until after he had written a letter of complaint to the Civil Service Commission. It appears that although municipal funds were available for the purpose, Director King chose to retain McCall rather than appoint a regular building inspector. King nonetheless insisted before the Commission that he could not appoint Greco because he did not have the money in his budget, funds not being available until he could transfer them in November 1948. After Greco had written the Commission he received a call from Smith, who at that time was deputy chief of police but not yet a member of the governing body. Smith was related to Director King through marriage. He asked petitioner "what the adverse publicity concerning King was about"; Smith seemed annoyed and remarked that Greco *187 should "cut it out or it won't be good" for him. Thereafter he took Greco to King's summer home where King signed a letter, previously prepared by Smith, appointing petitioner as building inspector.
Greco testified that from the time of his appointment onward Director King displayed a resentful attitude toward him. When Greco tried to discuss official business, King would walk away without answering. Except for a brief period when he was able to get secretarial help from another department, petitioner was without secretarial or clerical assistance, despite repeated requests made of Director King, all of which were refused. The bulk of Greco's secretarial work had to be performed at home by his wife.
Asked about his relations with petitioner, King testified: "I get along with anyone and also with Mr. Greco but he couldn't get along with me." At the hearing before the Commission King acknowledged that Greco's work was satisfactory, but he complained of his "attitude toward the people that were coming in and his attitude toward him [King] at all times too." Pressed to explain what he meant by Greco's attitude toward him, he said that citizens were calling up and making complaints about the building inspector's attitude; "They said he was arrogant and things like that. I tried to get along as best I could." King acknowledged, however, that petitioner was not arrogant toward him. In further elaboration of the subject he stated that Greco's inability to get along with him manifested itself by his "not being congenial with the people coming in."
One particular incident throws light upon and explains in good measure the strained relations existing between King and Greco. In November 1954, a short time before petitioner was discharged, Belleville held a referendum on the question of adopting a new form of municipal government. The attempt proved unsuccessful. Greco had been in favor of the change; King naturally favored retention of the commission form. Greco testified that soon after the referendum he met Director King at the City Hall and extended his hand to congratulate him upon his victory; that King looked at him *188 coldly and said, "I want to thank you for everything you did not do for me in the campaign," to which Greco countered "I would like to thank you, Commissioner, for everything you never did for me"; that King pointed his finger at him and said, "I will take care of you for that." King did not deny this conversation. His only testimony with reference thereto was that when he met Greco he said, "Thanks for what you did or what you did not do," the remark being explained as a "satirical comment."
Greco had on several occasions sought out Smith in order to persuade him to have the building inspector's office transferred to his department, apparently, as Smith speculated, that he might receive secretarial assistance or a possible raise in salary. Smith testified that he was unwilling to assist in bringing about the transfer. Then suddenly, and without prior notice to Greco, came the resolution of February 21, 1955, transferring the office of building inspector from Public Affairs Director King to Public Works Director Smith. Greco thought the purpose might have been to get him the salary increase and a secretary because, as he testified, he had talked to Smith about the matter and Smith had promised to get him "straightened out." However, when he spoke to Smith directly after the meeting at which the transfer resolution was adopted, Smith's only answer was "The Department was transferred," and "Don't think you are going to get away with the crap you did under Commissioner King." Smith's comment as to this testimony was that he did not recall the conversation. The notice of termination of Greco's employment came on the first business day following.
King, as might be expected, denied having any personal prejudice against petitioner, but (as noted) referred several times in his testimony to the complaints allegedly received from citizens about his conduct. On one occasion King actually tried Greco on formal charges supposedly based on complaints of citizens. The hearing resulted in an admonition to petitioner to improve his conduct. A greater insight into this incident is obtained from the testimony of John J. Goff, president of the Essex Council, New Jersey Civil Service *189 Association, relating to a conversation in Atlantic City with King regarding the pending charges against Greco. King told Goff that Greco was "too strict in his enforcement and it isn't good politically." He resented Greco's attempts to have the police and fire departments help enforce the building code. He said: "He will have to change his ways if he is going to stay on." There was also testimony about differences between King and Greco on an occasion when, despite pressure from King, petitioner refused to grant a certificate of occupancy for a building erected by a local industrialist because the walls did not meet minimum fire safety requirements.
The power of a municipality to abolish a position in the classified civil service, or to dispense with the services of one holding such position, cannot be questioned where such action is motivated by a bona fide desire to effect economies and increase municipal efficiency. The Civil Service Act recognizes such power. N.J.S.A. 11:22-10.1 and 10.2; cf. R.S. 11:22-9 and 10, repealed by L. 1952, c. 323. In such case it is incumbent on petitioner to show that the action taken was not for the purpose of economy. The presumption of good faith attends the municipal action, and the burden is on petitioner to show bad faith. Hunziker v. Kent, 111 N.J.L. 565, 566-567 (Sup. Ct. 1933); Santucci v. City of Paterson, 113 N.J.L. 192, 195 (Sup. Ct. 1934); Gianettino v. Civil Service Commission, 120 N.J.L. 531, 533 (Sup. Ct. 1938); Pellet v. Department of Civil Service, 10 N.J. Super. 52, 57 (App. Div. 1950); Sieper v. Department of Civil Service, 21 N.J. Super. 583, 586 (App. Div. 1952); Chirichella v. Department of Civil Service, 31 N.J. Super. 404, 409-410 (App. Div. 1954); and see Schnipper v. Twp. of North Bergen, 13 N.J. Super. 11, 14-15 (App. Div. 1951).
This is not a case where the position of building inspector was a useless and unnecessary one. Where an office or position is unnecessary or useless, and can be abolished without impairing departmental efficiency, the motive for abolishing the office or position, or of discharging the incumbent, *190 is immaterial; that there are considerations other than economy motivating the municipal action is of no consequence in such case. Such was the situation in Hunziker v. Kent, above (county's financial affairs had reached an acute stage and prosecutor of pleas' reduced appropriation was practically exhausted); Santucci v. City of Paterson, above (municipal financial stringency made reduction of personnel imperative); Kessel v. Civil Service Commission, 130 N.J.L. 618 (Sup. Ct. 1943); Pellet v. Department of Civil Service, above (personnel of heavily overstaffed law department radically reduced); Benzoni v. Department of Civil Service, 10 N.J. Super. 103 (App. Div. 1950) (position a sinecure and required only ten days' work a year); Padavano v. Twp. of North Bergen, 13 N.J. Super. 6 (App. Div. 1951); Elwell v. Twp. of North Bergen, 13 N.J. Super. 330 (App. Div. 1951); Chirichella v. Department of Civil Service, above (municipal reorganization under new form of government, resulting in abolition of positions of secretary to department heads).
On a consideration of all the circumstances, we have concluded that petitioner has sustained the burden of showing that bad faith, and not true considerations of economy and municipal efficiency, motivated his discharge. The mere fact that the removal of an individual from the municipal payroll results in an economy is not the exclusive test, since such removal will always be manifested by a saving. The question is, not narrowly whether a plan conceived and adopted for the purposes of saving money actually, in operation, attained that purpose, but whether the design in adopting the plan was to accomplish economy or, on the contrary, was to effect the removal of a public employee, protected by civil service, without following the statutory procedure for removal. City of Newark v. Civil Service Commission, 112 N.J.L. 571, 574 (Sup. Ct. 1934), affirmed 114 N.J.L. 185 (E. & A. 1935).
The abolition of a position in the municipal service, or the discharge of the person occupying that position, must not be merely colorable or a device for circumventing the *191 employee's civil service protection while retaining his position in substance. City of Camden v. Civil Service Commission, 118 N.J.L. 501 (Sup. Ct. 1937); Mattia v. City of Newark, 122 N.J.L. 557 (Sup. Ct. 1939); City of East Orange v. Civil Service Commission, 132 N.J.L. 181 (Sup. Ct. 1944); Pellet v. Department of Civil Service, above, 10 N.J. Super., at page 57. We are of the firm opinion that Greco's discharge served to eliminate a person whom Director King considered an undesirable and perhaps politically embarrassing official. Director Smith, related to King by marriage, readily joined in his scheme.
The position of building inspector was not abolished. Its functions and duties were turned over to and assumed by the town engineer, Sheehan, and his staff, which included an assistant engineer and an engineering aide, along with three clerks. Sheehan was given the title of "acting building inspector," a position which had no legal standing because it had never been created by ordinance.
It is to be noted that the duties and functions of the building inspector and of the town engineer, both detailed in an ordinance adopted August 26, 1947, were fundamentally different. Essentially, the duty and responsibility of the building inspector was to enforce the building code and the zoning ordinance, and to do such related work as was required. The town engineer was responsible for the design, construction, inspection and maintenance of public works projects, and the performance of related work as required. In this connection it is appropriate to consult and apply R.S. 11:22-12 which provides that no person shall be appointed or employed under any title not appropriate to the duties to be performed, nor assigned to perform duties other than those properly pertaining to the position which he legally holds.
Greco testified that his duties as building inspector had required full time, and often necessitated work after regular business hours. Sheehan, however, stated that these duties, after transfer to him, took on an average of three to three and one-half hours a day. We find petitioner's testimony *192 the more credible and supported by the evidence. In the calendar year 1954 the building inspector processed 1149 different applications, 474 of them being for building permits, 264 for certificates of occupancy, and 28 involving zoning appeals; and $2,367,935 in construction costs was involved. The figure for the calendar year 1953 was 1489 permits involving $2,825,074 in construction costs. The building inspector's office was self-sustaining. We have, further, the uncontroverted representation that every municipality in New Jersey of Belleville's size (34,000) or larger has a full-time building inspector.
The building inspector's activities have not been curtailed; there has been no radical decrease in the volume of duties and services, nor in the revenue derived therefrom. The office is one of importance to the well-being of a growing municipality. Its design is to promote the public safety and welfare. Cf. City of Camden v. Civil Service Commission, 118 N.J.L. 501 (Sup. Ct. 1937).
We are convinced that the municipal action here under attack was not motivated by a bona fide yearning for economy and greater municipal efficiency. The office itself remains in existence; indeed, the 1955 budget, projected and under study by the governing body at the very time of petitioner's discharge, carried an appropriation for the position. This appropriation was not eliminated when the budget was finally adopted. The municipality points to no other economy effected through abolition of jobs or the consolidation of the duties of different positions. There was no reconstitution or reorganization of the local government itself, as in some of the cases cited above, calling for the sudden transfer of the building inspector's office, part of the Building Department, from the Department of Public Affairs to the Department of Public Works. Greco's discharge was an isolated exercise in so-called municipal economy.
We may also observe  and this is evident from the record  that if the town engineer's office, with its staff of three engineers and three clerks, could handle the additional load of the building inspector's work, it must have been overstaffed *193 at the outset. Town Engineer Sheehan's assistant, Faust, received a salary of $5,260. Since the engineering staff had sufficient time to contribute several hours a day to the building inspector's duties, it is fair to conclude that the more economical arrangement would have been to retain petitioner at his $4,400 annual salary and permit him to continue to discharge all his duties in connection with the building code and zoning ordinance; to dispense with Faust or the engineering aide under him whose services were admittedly not fully utilized, and to require the town engineer to work full time.
All in all, what was done here under the guise of "economy" was, in the words of City of East Orange v. Civil Service Commission, 132 N.J.L., above, at page 185, "colorable and illusory, and in essence an evasion of the Civil Service Law." Petitioner has carried the burden of proving bad faith, spelled out from words, conduct and all the surrounding circumstances and facts. The real objective stands exposed to view  to get petitioner out of his building inspector's position without abolishing it or giving him a hearing on charges.
The determination of the Civil Service Commission is reversed.