**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0066-18
              A-0067-18
              A-0069-18
              A-0071-18
              A-0074-18
              A-0076-18
              A-0078-18
              A-0080-18
              A-0082-18
              A-0083-18
              A-0084-18

IN THE MATTER OF THE
LAYOFF OF DAISEY BATTLE,
LATISHA D. BELL, YOLANDA
BELL, SHANTAH CANTY, LORENZO
O. CARTER, RACHERYL CHANCE,
LISA COX, ELAINE C. DANIEL,
WILL DAVIS, HECTOR ESPADA,
AWILDA FERNANDEZ, SHANEIKA
FORENBERRY, JERALD GOLSON,
GIGI L. GOODWIN, STEVEN R.
HAM, JR., DALHINE HARDIN,
VIRGEN HERNANDEZ, JUAREZ
HILL, JUANITA HOLT, UZERA
JACKSON, RASHEED JACOB,
MICHAEL JAMES, REGINA
JOHNSON, IRIS LABOY, OMAR
S. MACE, KENYLA MARSHALL,
ALNEISHA MCCLAIN, ARDELIE
MCELROY, OCTAVIA MCKINLEY,

RAJAHN MILES, SHARON MORRIS, ANTONIO R. PADILLA, JACQUILLA PATRICK, LINDA PHELPS, BOBBI PITTMAN, JACLYN QUILES, CECILIA RAMOS, KECIA L. RASBERRY, NELSON R. RIVERA, TANYALE ROBINSON, WANDA ROBINSON, ELIZABETH J. ROSADO, AQUEELAH SCOTT, SHANNON SHELTON, LOUIS SLATER, DARRELL SMITH, LATEEFAH C. TOWNES, ERIC TYSON, ROSE VENABLE, GLORIA VINES, CARMELITA L. WARD, LA-TONYA WARD, MELINDA WHITEHEAD and KEISHA WILLIAMS BY THE CITY OF NEWARK.

_____

IN THE MATTER OF THE LAYOFF OF PARVEEN A. ARASTU, BETHZAIDA CRUZ, RAFAEL A. PADILLA, SAMIAH SALEEM and ROBERT WEST BY THE CITY OF NEWARK.

_____

IN THE MATTER OF THE LAYOFF OF RENU NAGPAL BY THE CITY OF NEWARK.

_____

IN THE MATTER OF THE LAYOFF OF PARVEEU A. ARASTU, JOIA R. BARNES, DICKSON O. OGUINYE, MARGARET R. PARISH, ELIZABETH RAINEY, TIMIA L. WILSON, GAYLE WINSOME and CELESTE R. WRIGHT BY THE CITY OF NEWARK.

_____

IN THE MATTER OF THE LAYOFF OF

VANCYEE WARREN BY THE CITY OF NEWARK.

_____

IN THE MATTER OF THE LAYOFF OF ZEKIA BENYARD, O. GINA CARTER, MARY HILL, ANN KUILAN and DEICLES MOSCHEN BY THE CITY OF NEWARK.

_____

IN THE MATTER OF THE LAYOFF OF PAMELA LEWIS, KAWANDA CORSEY, ELLA HARRIS, LATOSHA INGRAM, ADELINA ORTIZ, CAROLYN PARKER, TONYA SMITH, KENYETTA STEED, CRYSTAL WILLIAMS, HENRIETTA WILLIAMSON, LYNDA WORSLEY, and DEISA WYCKOFF-VALENTINE BY THE CITY OF NEWARK.

_____

IN THE MATTER OF THE LAYOFF OF EVALDO SEGATTO BY THE CITY OF NEWARK.

_____

IN THE MATTER OF THE LAYOFF OF MAYRA ACOSTA, TOMMY EASTERLING, PAMELA D. ESTES, JOSEPH GROLLER, LATEEF A. IBIKUNLE, DEBRA JACKSON, SHASHAWNA A. KELLEY, RHONDA MCDONALD, LUIS M. MUNOS, TRAKOR U. PATEL, GLADYS PAUL, LAKINA D. PORTS, DELIAPHINE M. ROBINSON, MICHAEL A. SHEFTON, TAHSHEEN WILLIAMS and WILLIAM TURNER BY THE CITY OF NEWARK.

_____

3

A-0066-18

IN THE MATTER OF THE LAYOFF OF
MIKO ALEXANDER, YVONNE AUSTIN,
PRESTON BIGELOW, MICHELE BRAGG
and OBALAJI JONES BY THE CITY OF
NEWARK.

_____

Argued January 25, 2021 – Decided May 10, 2021

Before Judges Messano, Hoffman and Smith.

On appeal from the New Jersey Civil Service Commission, Docket Nos. 2011-3536, 2011-2422, 2011-4168, 2011-3368, 2011-2627, 2011-3347, 2011-2645, 2011-3355, 2011-2629, 2011-3386, and 2011-3573.

Cheyne R. Scott argued the cause for appellant City of Newark (Chasan Lamparello Mallon & Cappuzzo, PC, attorneys; Cheyne R. Scott, of counsel and on the briefs; Cindy Nan Vogelman, on the briefs).

Edward H. Kerwin argued the cause for respondents Newark Council 21 and Represented Members/ Employees (Law Offices of Daniel J. Zirrith, attorneys; Daniel J. Zirrith, of counsel and on the brief; Lindsay A. Stehling and Edward H. Kerwin, on the brief).

PER CURIAM

In 2010, appellant City of Newark (the City) faced an unprecedented fiscal crisis, including a significant budget deficit that affected its credit and bond ratings. Needing to reduce personnel costs, its most significant budget expenditure, the City instituted a hiring freeze, returned employees to lesser job

4

titles, terminated provisional employees, and implemented mandatory furlough days. Realizing it could not avoid layoffs, the City began negotiating with union representatives regarding proposed personnel cuts.

In these consolidated appeals, we address the decision of the City to lay off almost 1000 employees to address the 2010 budget crisis. In total, the City laid off 983 employees, including 860 terminations and 123 demotions. The City proposed the layoffs become effective on November 12, 2010. On September 23, 2010, the Civil Service Commission (the CSC) approved the City's layoff plans.

Respondents, 110 former employees of the City, filed appeals with the CSC, pursuant to N.J.S.A. 11A:8-4, arguing that their layoffs were not made in good faith. In 2011, the appeals were transferred to the Office of Administrative Law (OAL), where they were consolidated and scheduled for a hearing before an Administrative Law Judge (ALJ).

Discovery disputes arose during the pendency of the layoff appeals, with the City contending that it responded to all discovery requests by producing nearly 6,000 pages of documents and interrogatory answers. Respondents disagreed and filed a motion for sanctions, seeking the suppression of the City's defenses and counsel fees associated with the motion. Rather than merely

deciding the pending discovery motion, the ALJ issued a dispositive decision in an Initial Decision, dated January 19, 2018. Notably, the ALJ found that the City failed to comply with prior discovery orders generally. Based on this finding, the ALJ struck the City's Answer and defenses, suppressed any testimony to be advanced on behalf of the City, awarded counsel fees, and rendered a determination on the merits that the layoffs in question were not made in good faith. The ALJ's Initial Decision became the CSC's Final Decision when the CSC lacked a quorum to undertake a substantive review of the Initial Decision.[1]

This appeal followed, with the City asserting that the ALJ erred by finding that it failed to provide discovery, imposing unreasonable sanctions, and rendering a decision regarding the layoffs' propriety as part of the discovery motion, rather than conducting a hearing on the merits. Following our review, we discern no basis to disturb the ALJ's decision regarding discovery issues and the imposition of non-dispositive sanctions; however, we conclude it was arbitrary, capricious, and unreasonable to enter a dispositive decision without

---

[1] Because of two vacancies and a third member's conflict of interest, the CSC lacked a quorum to undertake a substantive review of the ALJ's Initial Decision. When respondents refused to give any further extension to the CSC to permit the appointment of additional members, the Initial Decision was deemed adopted and became a Final Decision.

A-0066-18

holding a merits hearing. As a result, we affirm, in part, and reverse and remand, in part.

I.

Background on Public Employee Layoff Procedures

Under N.J.S.A. 11A:8-1(a) and N.J.A.C. 4A:8-1.1(a), a public employer may lay off an employee or employees "for economy, efficiency, or other related reason[s]." Before doing so, the employer, referred to in the relevant provisions as the "appointing authority," must attempt to "lessen the possibility, extent or impact of layoffs by implementing pre-layoff actions" including, but not limited to, initiating temporary hiring or promotion freezes; terminating temporary employees; returning provisional employees to their permanent titles; reassigning employees; and/or assisting potentially affected employees to find other employment. N.J.S.A. 11A:8-2(a); N.J.A.C. 4A:8-1.2. The employer must also meet with the majority representative for the potentially affected employees and obtain the approval of the Chairperson of the CSC prior to implementing such measures. N.J.S.A. 11A:8-2(b); N.J.A.C. 4A:8-1.2 to -1.3.

If the employer decides that a layoff or layoffs are necessary, it must submit information to the CSC detailing its plans at least thirty days before issuing layoff notices to any potentially affected employees, including:

7

1. The reason for the layoff;

2. The projected effective date of the layoff;

3. Sample copies of the layoff notice and the projected date for issuance;

4. The number of positions . . . by title to be vacated, reclassified, or abolished and the names, status, layoff units, locations and, as of the effective date of the layoff, permanent titles of employees initially affected, including employees on leave;

5. The vacant positions in the layoff unit . . . that the appointing authority is willing to fill as of the effective date of the layoff;

6. A detailed explanation of all alternative and pre-layoff actions that have been taken, or have been considered and determined inapplicable;

7. A summary of consultations with affected negotiations representatives; and

8. A list of affected negotiations representatives, including addresses and the units they represent.

[N.J.A.C. 4A:8-1.4(a).]

The CSC will then approve the plan or direct the employer to take additional alternative measures, provide corrected information, or change the plan as necessary. N.J.A.C. 4A:8-1.4(b), (d).

Once the CSC approves the plan, the employer must give at least forty-five days written notice of its decision to lay off an employee. N.J.S.A. 11A:8-

1(a); N.J.A.C. 4A:8-1.6(a). The employer must also provide the CSC with "a list of the names and permanent titles of all employees receiving the notice." N.J.S.A. 11A:8-1(a). The CSC ensures the list's compliance with N.J.S.A. 11A:8-1(b), which requires that employees in State or local service "shall be laid off in inverse order of seniority." N.J.A.C. 4A:8-1.1(b); N.J.A.C. 4A:8-2.2; N.J.A.C. 4A:8-2.4. The CSC also determines whether any listed employee has "lateral [or] demotional title rights" that would allow him or her to remain employed by "bumping" a less senior employee, and/or "reemployment rights" to be placed on a list to be rehired later on. N.J.S.A. 11A:8-1(f), (h); N.J.A.C. 4A:8-1.1(b); N.J.A.C. 4A:8-2.1; N.J.A.C. 4A:8-2.3. These determinations are made prior to the effective date of the layoff, and the CSC then assumes responsibility for sending its final notices to the affected employees. N.J.A.C. 4A:8-1.1; N.J.A.C. 4A:8-1.6(f).

A laid off employee has the right to "appeal the good faith" of his or her layoff to the CSC within twenty days of receiving the final notice. N.J.S.A. 11A:8-4. In such an appeal, the employee may "claim that the appointing authority laid [him or her] off . . . for reasons other than economy, efficiency, or other related reasons." N.J.A.C. 4A:8-2.6. The employee has the burden to demonstrate that he or she was laid off in bad faith. N.J.S.A. 11A:8-4; N.J.A.C.

4A:8-2.6(c).  In the event of a finding of bad faith, the employee may be awarded "back pay, benefits and counsel fees . . . ."  N.J.A.C. 4A:2-1.5.

The Newark Layoffs

As noted, in 2010, the City faced, in the words of its Acting Business Administrator Michael Greene, "an unprecedented fiscal crisis due to a vast range of circumstances," including the loss of "millions of dollars in both ordinary and extraordinary municipal state aid" and other "key revenue sources." According to Greene, the City faced a "significant budget deficit"[2] and a review of the City's budget demonstrated that its "most significant budget expenditure [was] personnel costs"; as a result, any changes to the City's budget required the reduction of these costs.

Once the City realized that it could not avoid layoffs, it began negotiating with union representatives for the Departments in which it planned to propose personnel cuts.  In a July 6, 2010, e-mail to Newark's Council President, Vice-President, Clerk, and Deputy Clerk, Greene stated that the Mayor had directed the City to "right-size" its work force, because this would put it on a "'pathway' to achieving structural integrity and balanced budgets."

---

[2] In a July 2010 email, Greene projected a "budget gap" of $188 million.

A-0066-18

On August 24, 2010, the City sent letters to the CSC detailing "proposed layoff plans" for the following Departments:

- Mayor's Office and related agencies
- Department of Neighborhood and Recreational Services
- Police Department
- Department of Administration
- Department of Child and Family Well-Being
- Department of Economic and Housing Development
- Department of Engineering
- Fire Department
- Department of Finance

Each plan listed the positions within the relevant Department that would be vacated, reclassified, or abolished, and the names and salaries of the individuals holding those titles who would be laid off. On September 27, 2010, the City sent an amendment to the CSC asking that the layoff proceedings for all seven proposed employees in the Mayor's Office be rescinded. It sent similar letters on October 26 and 27, 2010, regarding four of the 395 employees proposed for layoff in the Department of Neighborhood and Recreational Services, and four of the eight employees proposed in the Department of Finance, respectively.

The plans all stated the City proposed the layoffs for "economy and efficiency." They also provided some Department-related reasons for removing positions. For example, the plan for the Department of Neighborhood and

11

A-0066-18

Recreational Services stated that many services this Department provided were not "revenue generating," and that its expenses had grown. The City thus wished to eliminate employees and "outsourc[e]" to contractors. For the Police Department, the City stated that laying off officers would allow the City to "operate more efficiently." Similar explanations were stated in other plans; however, the plans did not state why the City had chosen the specific titles or individuals listed for elimination. The City proposed the layoffs would become effective on November 12, 2010. In total, the City contemplated the layoff of 983 employees, including 860 terminations and 123 demotions.

On September 23, 2010, the CSC approved the City's layoff plans. It directed the City to issue "general and individual notices of layoff" to affected employees by September 28, 2010. On September 27, 2010, the City issued a "General Notice of Layoff or Demotion" to the selected employees. The notice informed these employees that it was "possible" they may be "subject to layoff," and explained that the CSC would determine each employee's "seniority, lateral displacement, demotional and/or special reemployment rights."

Subsequently, in letters dated October 29, and December 9, 2010, the CSC informed the affected Newark employees, including respondents, that they would be laid off as of November 12 for those receiving October 29 letters or

December 23 for those receiving December 9 letters. The letters explained to each employee that the CSC had determined he or she had no "displacement rights" to move to another employee's position. They also stated that the employees' names would be placed on a "Special Reemployment List" for their job titles and "other titles that may be deemed appropriate," "for certification against future vacancies." In addition, the letters informed the employees of their appeal rights.

Prior Discovery Proceedings

Respondents served the City with a set of fifty-one interrogatories. Of relevance here, Question 1 asked for the names of "all persons having knowledge of any facts or information relating to the [City']s decision to lay off [respondents]" and "the source of knowledge of each such person . . . and the facts or information (not just conclusions) within the knowledge of each such person." It asked the City to provide copies of "all documents that embody any facts or information within the knowledge of each such person." The City listed fourteen individuals and stated, "Layoffs were for economy and efficiency. Person[s] identified reviewed the budgets and staffing (all materials attached as answers to questions within)."

13

Questions 7 through 15 asked for the names of individuals who had information regarding how the City "determined which titles and/or positions would be eliminated in the layoff"; names of individuals who "participated in or contributed to the decision to lay off" respondents; the sources of these people's knowledge and information; the "facts and circumstances (not conclusions) upon which [the City] relied in making the decision to lay off" respondents; documents upon which the City relied; and "the reasons why [the City] chose to lay off each of the [respondents] . . . including, but not limited to, stating why [the City] chose to lay them off as opposed to the City of Newark employees who were not laid off." The City responded to Questions 7 through 9 with "See Answer #1," and to Questions 10 through 15 with "Please see attachment marked Question #10."

Questions 18 through 20 asked for organizational charts for the City from the period of January 1, 2008, through the time of the City's responses to interrogatories, and descriptions of each Department and subunit, including information about the work each performed, lists of titles employed in each, numbers of employees employed in each title, and job descriptions for each title. In answer, the City attached various documents described below.

Questions 28 through 42 asked for information including: the number of employees on the City's payroll from January 2008 through the date of the interrogatory responses; the number of employees for each individual Department; the salaries of each respondent at the time of his or her layoff; the names, titles, units, work locations, and salaries or wages of all employees of the City as of the last pay periods prior to January 1 in 2008, 2009, 2010, 2011, 2012, and the date of the responses; information about individuals hired by the City after January 1, 2008, including salaries or wages, union status, and titles; information about any individuals re-hired after being laid off; information of "all individual employees who [were] currently performing the duties and functions of the positions that were held by [respondents] at the time of each of their respective layoffs"; and information about any employees who were transferred to other Departments within the City after January 1, 2008.

On January 8, 2013, the parties conducted a telephone conference during which the ALJ asked them to engage in good faith efforts to resolve outstanding discovery issues. On January 21, 2013, respondents sent a letter to the City with a chart listing deficiencies it had found in the interrogatory responses. Respondents stated that the City's answer to Question 1 did not truly provide the sources of information held by the identified individuals. They asserted that this

15

deficiency extended to the answers to Questions 7 through 15, because these referred back to the Question 1 response or to "a stack of documents." They contended that these answers thus did not describe any of the information, methods, processes, or reasons underlying the City's decision to lay them off. For Questions 18 through 20, respondents stated that the documents the City provided did not actually include any organizational charts, or any statement that such charts did not exist. For Questions 28 through 42, they again complained that the City's response merely referred to "a stack of documents," which they contended was "improper."

The City responded on March 1, 2013, stating that the only outstanding information was the City's 2012 budget, information about temporary employees, and information about experts. The City provided the budget shortly thereafter.

On March 8, 2013, respondents' counsel wrote to the ALJ documenting the deficiencies it identified in the City's responses, their attempts to obtain additional information from the City, and the City's answer to those efforts. Respondents stated that the City's March 1 response ignored the bulk of the discovery deficiencies they had reported, including all of those pertaining to the City's answers to interrogatories.

16

A-0066-18

On April 30, 2013, respondents filed a motion to compel discovery, again listing deficiencies in the responses they received from the City. The City filed a response on May 23, 2013, asserting that it had sent "over 500 pages of information" to respondents on November 9, 2012, followed by "additional information" on March 1, 2013. The ALJ granted respondents' motion on May 31, 2013, ordering that the City provide fully responsive answers to the discovery requests as addressed in respondents' list of deficiencies, within fourteen days. Respondents' request for attorney's fees associated with the motion was denied.

On June 17, 2013, the City provided respondents with revised answers to the fifty-one interrogatories. However, the answer to Question 1 remained the same apart from adding four more individuals who possessed knowledge concerning the layoffs; it again stated only that the layoffs were for "economy and efficiency" and that the identified individuals reviewed their budgets and staffing. For Questions 7 through 15, the City provided the names of relevant individuals and stated again that these people reviewed "their budgets and staffing" to determine "which services should be consolidated or more economically performed by an outside vendor." The City stated that the directors of the departments in which respondents worked reviewed "the 2008-

2010 budgets" and "the City of Newark ordinances" outlining the functions of each department. It further indicated that respondents should "see the City of Newark Layoff plan submitted to the [CSC]" for a description of the reasons why they were chosen for layoff.

In answer to Questions 18 through 27, which requested budget information and organizational charts, the City stated that it had provided documents including "payment registers for all employees of the City" for the years respondents listed. The City once again referred to sets of documents in its response to Questions 28 through 42.

On June 27, 2014, the City provided another new set of answers to respondents' interrogatories. Its answer to Question 1 added a further four individuals' names, but still referred only to "economy and efficiency" and "budgets and staffing." The answers to Questions 8, 10, and 13 were also the same as in the previous response. The City's responses to the questions about salaries and other information for laid off, newly hired, and all other employees now referred to each year's budgets, and to a document called the "Employee Head Count Report."

On June 28, 2013, respondents wrote to the ALJ, reporting that "few" of the City's interrogatory responses had been changed and that the "specifics" they

had requested were "rarely given." Respondents asserted the City's answers were not "fully responsive," as ordered, and therefore requested adjournment of the hearing dates on the merits to allow completion of discovery.

Respondents filed two more motions to compel discovery, on February 19, 2015, and November 25, 2015, arguing that there were still deficiencies in the City's responses. Specifically, respondents maintained that the City's answers to the interrogatories requesting the reasons why they, in particular, were chosen for layoff remained non-responsive. These motions were granted on September 16, 2015, and January 12, 2016, respectively. Each time, the ALJ ordered the City to provide fully responsive answers within twenty days, and imposed attorney's fees and costs.

Final Discovery Provided

Based on the record on appeal, it appears that ultimately, the City provided the following documents in response to Questions 1, 10 through 12, and 15: 1) the City's layoff plans for each Department; 2) the CSC's approval of those plans; 3) personnel orders from the Police Department to employees regarding their impending layoff; 4) a list of laid off employees of the Department of Neighborhood and Recreational Services stating who had assumed those employees' duties; 5) a November 25, 2013 e-mail from the Director of the

19

Department of Child and Family Well-Being stating that six of the nine employees laid off in that Department were terminated due to "discontinuance of laboratory services" or for "economy and efficiency"; and 6) a September 28, 2010 e-mail from the same Department informing employees that there would be nine layoffs, and listing the titles affected.

In an area of the record not specifically designated as part of the response to these questions, the City also provided various correspondences among City employees discussing the layoffs. In one conversation, a personnel officer in the Department of Administration asked to substitute one title for another in the group to be laid off, based on the fact that the initially chosen title was one the Department could not "afford to loose [sic]." The other correspondences do not discuss specific reasons for choosing the titles to be terminated, but instead contain lists of titles – and in some instances the individuals holding those titles – to be eliminated from each Department, and discussions about the need for cost savings in each Department. The City also provided respondents with documents concerning Newark's budget crisis in general.

In response to Questions 18 through 20, which requested organizational charts and descriptions of the work performed by each affected Department, the City provided: 1) a collective bargaining agreement between the City and the

20

Union Newark Council No. 21; 2) City Executive Orders regarding personnel and salaries; 3) City Administrative Code provisions regarding the affected Departments; and 4) the requested organization charts. A 2012 budget provided in response to Question 28 also appears to have information about the organization of the City's Departments within it. The City additionally provided respondents with official CSC job specifications/descriptions for the titles affected by the layoffs, by Department.

In answer to Question 21, which requested that the City "state [its] total aggregate salary expenditures" for 2008, 2010, 2011, and from 2012 through the time of the interrogatory response, on an annual, monthly, and biweekly basis, the City provided budgets for each of the Departments affected by the layoffs and other municipal budget documents. These documents showed the amounts budgeted for personnel salaries and wages for each year, and expenditures by job title, for each of the years requested.

The City provided the following documents in response to Questions 28 and 29: 1) a document labeled "City of Newark Employee Headcount," which listed every City employee's name, job code and description, work hours, annual salary, and hire date; 2) municipal budgets for 2008, 2009, 2010, and 2012; and 3) documents titled "Transaction Logs" for 2008, 2009, 2010, and 2011 showing

21

similar information. Two other documents labeled "Headcounts" for 2009 and 2011 were provided in response to Questions 21 through 25, 28, 29, 32 through 34, 36 through 38, 41, and 42. The documents included information for City employees for the given years, including titles, salaries, and if they were promoted, suspended, or terminated, or if they retired or passed away during the year. In answer to Question 36, the City provided a list of individuals re-hired after the layoffs.

Discovery Sanctions Motion

On August 24, 2017, nearly six years after the cases were transmitted to the OAL, respondents filed a motion for sanctions against the City for failure to comply with the prior discovery orders. They argued that their discovery demands "reasonably [sought] specific information about how [the City] chose to lay off the employees it did, how the duties of the [laid off] employees were handled after the layoffs, and other related inquiries," but that the City had "refuse[d] to provide any such specifics, instead choosing to hide behind general documents and declarations about 'economy and efficiency.'" Respondents requested attorney fees and costs associated with the motion as well as the suppression of the City's evidence and defenses to their claims. The City responded on September 20, 2017, asserting that it had provided complete

answers to the discovery requests and requesting a determination as to the responsiveness of these answers.

On October 2, 2017, the ALJ heard oral argument on the motion. Respondents' counsel argued that the City's response to Questions 1, 7, 8, 10 through 12, and 15 remained deficient, because it did not provide specific answers regarding the sources of knowledge for each individual the City named. He also asserted that the layoff plans the City sent to the CSC were not responsive, because the questions had asked for "the actual facts that were relied on in forming" those plans. Counsel conceded that respondents were provided with organizational charts in response to Questions 18 and 19; however, he argued that the City had not provided the additional information about the work performed by the departments requested in Question 20. He further stated that the Headcount documents the City claimed responded to several questions were not satisfactory because they were not searchable and did not state what City witnesses might "testify to" at a hearing on the merits.

For Question 33, which asked for the salaries and job descriptions of individuals hired after January 1, 2010, respondents' counsel stated that the descriptions were never provided. He explained that these were necessary to learn whether the City had laid off respondents and then hired other individuals

23

to do newly-named jobs with all of the same responsibilities rather than re-hiring respondents as normally would be required. Counsel also asserted that the City's response to Question 34, which requested further information about individuals identified in Question 33, did not provide this information and simply referred to the Headcount documents. He argued that the Headcounts similarly did not answer Question 40, which asked the City to identify individuals who were currently performing the duties of the positions formerly held by respondents, or Questions 41 and 42, which requested information about transferred employees.

The City's counsel explained that she was not "the original attorney on the matter," but that she had reviewed the City's response and felt that it "was compliant in answering the interrogatories." Specifically, she argued that the layoff plans submitted to the CSC properly stated the reasons for the layoffs in each department. She further asserted that while the City "made the recommendation" for certain positions and individuals "to potentially be affected by the layoff," the ultimate "decision based on seniority and displacement rights and special reemployment [was] up to [the CSC]."

Counsel also stated that the City undertook the layoffs because of its fiscal difficulties, and that the department heads "reviewed their budgets" and made

decisions "as to . . . maybe we could consolidate some of these assignments or it's more economically efficient to go with outside vendors as opposed to having these individuals continue on staff." She argued that "ultimately the reason that the City decided to lay off was for economy and efficiency," and that the budget and Headcount documents the City provided to respondents answered the questions about the reasons for the layoffs and the City's employees after the layoffs were completed. She stated that respondents would simply "have to go through the documents and find" the information they sought.

ALJ's Decision

On January 19, 2018, the ALJ issued an Initial Decision addressing respondents' motion. He explained that a layoff action by an appointing authority like the City "must be based in good faith on a desire to achieve economy and efficiency," and that respondents had the burden of proof to demonstrate that their layoffs were not implemented for such a reason. He stated that "[i]n short, the validity of the layoff[s] is based on the intention, or state of mind, of the appointing authority," and that therefore, respondents needed "a statement from [the City] as to the reasons for the layoffs and in particular for choosing the specific individuals in question."

The ALJ said that respondents had asked for "specific details as to the reasons" they were laid off, and that the City's response did not "give an explanation as to the reasons that specific individuals were chosen for layoff" from among all City employees. He further found that the City failed to demonstrate at oral argument that it had produced fully responsive answers to respondents' discovery requests. As a result, the ALJ found that the City failed to comply with the May 13, 2013, September 16, 2015, and January 12, 2016, discovery orders.

Next, the ALJ found that the City's failure to comply was unreasonable. He noted that significant time had passed since respondents served their discovery requests, and that the questions and document requests at issue were "central to the case." He stated that the City "did not offer an adequate explanation for its failure to provide appropriate response."

As to respondents' request that the City's answer, defenses, and evidence be suppressed as a sanction for failure to provide discovery, the ALJ found that the City did not produce "essential information concerning the reasons for the layoffs," and that this "substantially hinder[ed]" respondents' "efforts to provide that the layoffs were not done in good faith." He concluded that "a lesser sanction . . . would not be adequate" redress for the City's discovery-related

26

failures. As a result, he granted respondents' suppression request. The ALJ then stated that the "effect" of this sanction was that "a determination that the layoffs in question were not done in good faith should be entered in [respondents'] favor." The ALJ ended his opinion by so ordering, and by additionally ordering the City to pay respondents' attorney's fees and costs associated with the motion.

The City filed exceptions to the Initial Decision with the CSC on March 2, 2018, arguing that it had adequately answered respondents' interrogatories. Specifically, it asserted that it told respondents the layoffs were "due to economy and efficiency" and that the individuals listed as having knowledge about the layoffs reviewed their budgets. It said it also provided the budget-related documents "that each [City] Department used to determine that a layoff was necessary" and emails between Department heads detailing "reasons why the City was in such a dire financial condition" and potential consequences of the budget crisis. The City further argued that the CSC approved its layoff plan, and that the plan and the approval letter were provided to respondents. Finally, it contended that its "Headcount" documents contained "all information requested" by respondents regarding the numbers of City employees of various types; their wages; their union status; and other similar information.

The City argued that it had "supplied over 5,000 pages of documents and several supplemental interrogatory answers in a good faith attempt to resolve discovery issues." It stated that despite this, respondents "simply continued to assert that [they] were not in possession of discovery." The City asserted the ALJ's decision would have "far-reaching and substantial consequences," because it would require the City to "add several employees for whom it does not have vacancies to its payroll," causing cash flow problems and affecting the City's bond rating. It argued that the ALJ's decision imposed "drastic, unbalanced and inequitable" sanctions without sufficient review of the record and without making sufficient findings.

Respondents filed an answer to the City's exceptions on May 15, 2018, contending that the City had "never provided answers to the interrogatories that would bind [it] at the hearing in this matter," and instead merely "referred to attached documents and a general answer that the layoffs were for 'economy and efficiency.'" Respondents asserted that the City had "failed to litigate this matter in good faith, causing [them] to suffer delay after delay without any basis for their actions."

As previously noted, the Initial Decision was deemed adopted and became a Final Decision of the CSC on July 27, 2018, because the CSC lacked a quorum

to undertake a substantive review of the ALJ's Initial Decision. As a result, the CSC never completed a substantive review of the ALJ's Initial Decision. Nor did the CSC consider the City's exceptions to the decision. These appeals followed. On October 9, 2018, we granted the City's motion to consolidate the cases.

## II.

The City argues that the ALJ acted arbitrarily, capriciously, and unreasonably when he decided the discovery motion in respondents' favor, imposed sanctions, and rendered a decision on the merits, without holding a hearing placing the burden on respondents to prove that the layoffs were conducted in bad faith.

On appeal, the judicial capacity to review agency actions is "limited." Pub. Serv. Elec. and Gas Co. v. N.J. Dep't of Env't. Prot., 101 N.J. 95, 103 (1985). An agency's "final quasi-judicial decision" should be affirmed unless there is a "'clear showing' that it is arbitrary, capricious, or unreasonable, or that it lacks fair support in the record . . . ." Circus Liquors, Inc. v. Governing Body of Middletown Twp., 199 N.J. 1, 9 (2009) (quoting In re Herrmann, 192 N.J. 19, 27-28 (2007)). The reviewing court is restricted to three inquiries:

> (1) whether the agency action violates the enabling act's express or implied legislative policies; (2) whether

A-0066-18

there is substantial evidence in the record to support the findings upon which the agency based [its] application of legislative policies; and (3) whether, in applying the legislative policies to the facts, the agency clearly erred by reaching a conclusion that could not reasonably have been made upon a showing of the relevant factors.

[Pub. Serv. Elec. and Gas, 101 N.J. at 103.]

"Even if a court may have reached a different result had it been the initial decision maker, it may not simply 'substitute its own judgment for the agency's.'" Circus Liquors, 199 N.J. at 10 (quoting In re Carter, 191 N.J. 474, 483 (2007)). The court's "strong inclination" is to "defer to agency action that is consistent with the legislative grant of power." Lower Main St. Assocs. v. N.J. Hous. and Mortg. Fin. Agency, 114 N.J. 226, 236 (1989). Courts typically defer to an administrative agency's "technical expertise, its superior knowledge of its subject matter area, and its fact-finding role." Messick v. Bd. of Rev., 420 N.J. Super. 321, 325 (App. Div. 2011).

However, "[t]he interest of justice" allows a court to "abandon its traditional deference . . . when an agency's decision is manifestly mistaken." Outland v. Bd. of Trs. of the Tchrs. Pension and Annuity Fund, 326 N.J. Super. 395, 400 (App. Div. 1999). Further, a court is "not bound by an agency's conclusions of law." Brambila v. Bd. of Rev., 124 N.J. 425, 437 (1991).

A. Finding That the City Failed to Comply With Discovery

A-0066-18

The City asserts that it provided respondents with "information regarding its budget, as well as fiscal and economic data and documentation" and that it therefore complied fully with respondents' discovery requests and the ALJ's orders. It argues that the ALJ wrongfully focused on "state of mind evidence," because "the applicable legal standard . . . only require[d] the City to demonstrate that the Layoff Plan was the result of a documented budget crisis." It states that the discovery documents and interrogatory answers it provided "were sufficient to demonstrate that the layoff[s were] made in good faith for purposes of economy and efficiency." The City further contends that it is "impossible to discern" from the Initial Decision "what particular information" the ALJ felt the City failed to supply and "why it would have allowed [respondents] to meet their burden of proof."

The Administrative Procedure Rules, N.J.A.C. 1:1-1.1 through -21.6, set forth the rules governing "procedural aspects" of all "contested cases" requiring a hearing by an ALJ or agency head. N.J.A.C. 1:1-1.1(a). N.J.A.C. 1:1-10.1 states that the Rules specifically regarding discovery are intended to "facilitate the disposition of cases" by "giving litigants access to facts which tend to support or undermine their position or that of their adversary." To that end, parties in a contested case "shall commence immediately to exchange

31

information voluntarily," and "shall immediately serve discovery requests." N.J.A.C. 1:1-10.4(a) to (b). Any party may notify another party to provide discovery through interrogatories or requests for documents. N.J.A.C. 1:1-10.2. The party receiving a discovery request "shall provide the requested information, material or access [thereto] or offer a schedule for reasonable compliance with the notice" within fifteen days of receipt. N.J.A.C. 1:1-10.4(c). The parties must complete discovery at least ten days before the first scheduled evidentiary hearing or by a date ordered by the ALJ. N.J.A.C. 1:1-10.4(e).

We are satisfied the ALJ did not err in concluding that the City did not provide full and complete answers to respondents' properly issued interrogatories and failed to comply with the prior discovery orders. The documents the City submitted in response to Questions 1, 10 through 12, and 15, did not state the "source of knowledge" for each individual listed in response to Question 1, and did not include "written statements received from each such person and copies of all documents that embody any facts or information within the knowledge of each such person" as demanded by that question. They also did not describe "in detail and with specificity, the facts and circumstances . . . that each of the individuals identified . . . relied upon to determine to lay off any or all of [the affected employees],"or the "methods and processes" and "reasons"

A-0066-18

underpinning the decision to lay off respondents specifically, as requested in Questions 10 through 12 and 15.

The City's answers and documents explain Newark's need for layoffs in general. Respondents do not appear to dispute that the City was experiencing financial difficulties in 2010 or that some layoffs may have been necessary. However, respondents' interrogatories asked for information concerning how the City decided which titles or positions would be eliminated and the reasons why the City chose to lay off each individual respondent. In effect, respondents asked why they were selected instead of other employees. The City's response that the layoffs were conducted "for economy and efficiency" did not provide this information, nor did any of the documents turned over to respondents.

Further, the "Headcount" documents the City provided in response to many questions from 28 through 42 did not specifically state the "total number of employees on the [City's] payroll . . . for each month from January 2008 through the date of [the City's] answers" to interrogatories, or the "total number of employees . . . for each individual department . . . for fiscal years 2008, 2009, 2010, 2011, and 2012," as requested by these questions. Additionally, if the Bates stamping on these documents accurately represents how their pages were provided to respondents, they would have been difficult to read; the wide charts

33

of information could not be presented on a single landscape-oriented page, so the entries for any given employee were, and remain in the record on appeal, spread out over several disconnected pages that did not always even contain rows denoting the information in each column. Respondents' counsel noted at the October 2, 2017, hearing that these documents were not searchable for specific information. The "Transaction Log" documents were provided in a similar format, displaying the same difficulties with reading and interpreting them. The budget documents the City provided also gave information about each Department's expenditures, but only the 2012 budget contained data regarding employees specifically.

We reject the City's argument that the ALJ erred by focusing on "state of mind evidence." To succeed in their appeal, respondents needed to show that the City's reasons for laying them off were improper. N.J.S.A. 11A:8-4; N.J.A.C. 4A:8-2.6(c). Respondents sought discovery from the City regarding the reasons they as individuals were laid off and why their specific positions were chosen for elimination. This information was highly relevant to the issue of bad faith. Even if, as the City argues, respondents could not have met their burden had the material and information they sought been provided, that does not negate the fact that they properly and reasonably requested it in discovery.

 A-0066-18

It also does not excuse the fact that the City did not provide what respondents demanded and what the ALJ repeatedly ordered must be given. We reject the City's argument that its discovery responses were adequate because they were "sufficient to demonstrate" that the layoffs were conducted in good faith. An employer facing a layoff appeal under N.J.S.A. 11A:8-4 should not be permitted to choose not to answer the specific questions appealing employees ask in their interrogatories, then use its production of evidence presenting its actions in the best light to argue that its discovery responses were complete despite this deficiency. Again, the issue at this stage of the inquiry is not whether respondents could have succeeded on the merits with full answers to their interrogatories or whether any more responsive answers by the City would have demonstrated bad faith. It is whether the City answered the questions asked and provided the information requested. We conclude the City did not, and that the ALJ did not act arbitrarily, capriciously, or unreasonably in finding that the City violated his discovery orders.

The City next argues that even if the ALJ correctly found that it did not comply with discovery requirements, the sanctions he imposed – the striking of the City's briefs, defenses and evidence – were "impermissibly harsh."

A-0066-18

In general, the discovery rules that govern both cases in the Superior Court and contested cases in the OAL are designed "to further the public policies of expeditious handling of cases, avoiding stale evidence, and providing uniformity, predictability and security in the conduct of litigation." Zaccardi v. Becker, 88 N.J. 245, 252 (1982). The rules are meant to "eliminate, as far as possible, concealment and surprise" in the administration of a matter, so that decisions may "rest upon [the] real merits . . . and not upon the skill and maneuvering of counsel." Oliviero v. Porter Hayden Co., 241 N.J. Super. 381, 387 (App. Div. 1990). To that end, discovery rules and orders issued to enforce them "'must be adhered to' absent good cause." N.J. Dep't of Child. and Fams. v. E.L., 454 N.J. Super. 10, 20 (App. Div. 2018) (quoting Abtrax Pharms., Inc. v. Elkins-Sinn, Inc., 139 N.J. 499, 512 (1995).

The courts have recognized "it is necessary that there be adequate provisions for the enforcement of the rules [regarding] discovery against those who fail or refuse to comply." Lang v. Morgan's Home Equip. Corp., 6 N.J. 333, 338 (1951). Indeed, they have held that sanctions for failure to provide discovery or comply with discovery-related orders "are peculiarly necessary," ibid., and that a judge has the power to impose such sanctions "subject only to the requirement that they be just and reasonable in the circumstances."

36

Calabrese v. Trenton State Coll., 162 N.J. Super. 145, 151-52 (App. Div. 1978).

When reviewing the imposition of sanctions by an ALJ, as affirmed by an administrative agency, the "arbitrary, capricious, or unreasonable" standard of review applies. E.L., 454 N.J. Super. at 21-22.

Here, N.J.A.C. 1:1-10.5 provides that "[b]y motion of a party or on his or her own motion, [an ALJ] may impose sanctions pursuant to N.J.A.C. 1:1-14.14 and 14.15 for failure to comply with the requirements of" the rules regarding discovery discussed above. Of relevance here, N.J.A.C. 1:1-14.14 states that for "unreasonable failure to comply with any order of a judge or with any requirements of [the rules]," the ALJ may "suppress a defense or claim"; "exclude evidence"; "order costs or reasonable expenses, including attorney's fees, to be paid"; and "take other appropriate case-related action." Thus, the ALJ was permitted by the procedural rules to strike the City's briefs, defenses, and evidence due to its failure to comply with the prior discovery orders.

We conclude the ALJ did not act arbitrarily, capriciously, or unreasonably in imposing those sanctions. In Kolczycki v. City of East Orange, 317 N.J. Super. 505, 512 (App. Div. 1999), this court found that a trial judge appropriately suppressed the defendants' answer and defenses, because of their "persistent dereliction in providing discovery . . . ." There, the defendants were

37

ordered to provide answers to the plaintiffs' interrogatories and document requests but did not do so, causing the court to enter an order suppressing their answer and separate defenses. Id. at 513. The court granted the defendants' request that this order be vacated to allow them another opportunity to respond to the requests, and ordered them to provide discovery within fourteen days; the defendants again failed to comply, leading to the entry of the second suppression order which this court found was proper. Id. at 513-14. During the discovery dispute, the defendants "never filed any motions for protective orders or to limit the scope of plaintiffs' discovery . . . ." Id. at 514.

Here, the City repeatedly failed to provide the specific information respondents requested. Respondents made clear in their January 21, 2013, letter listing deficiencies, and in their later motions to compel documents, that they wanted the City to answer their questions regarding its choice to eliminate their positions/titles and lay them off specifically. They also listed other missing information. The City eventually turned over documents that responded to some of the interrogatories it initially failed to answer, such as the organizational charts and lists of re-hired employees. However, as previously noted, despite multiple orders from the ALJ, the City never provided several key answers. The City's failure to respond to discovery demands was therefore "persistent,"

Kolczycki, 317 N.J. Super. at 512, in a case where the ALJ was lenient, giving the City multiple opportunities to address its deficient discovery responses. The discovery period here went on for years, longer than in either of the above cases. While the City now asserts on appeal that respondents' requests were "overbroad and overly burdensome," it never filed any motions before the ALJ asking for relief from any part of them.

Under these circumstances, we conclude the ALJ's choice of sanctions was not arbitrary, capricious, or unreasonable, because he was permitted under N.J.A.C. 1:1-10.5 and -14.14 to order the suppression of the City's briefs, defenses, and evidence as a remedy for the City's unreasonable failure to comply with the discovery rules or with the prior orders.

The City alternatively argues that even if the ALJ was correct to strike its briefs, evidence, and arguments, he erred by going further and rendering a decision on the merits of respondents' appeals without further process. The City notes that such a determination was not requested by respondents in their motion to compel discovery. The City further argues that regardless of any finding that it did not comply with discovery, respondents had the burden of proof to show that the layoffs were not carried out in good faith. As a result, it contends, the ALJ should have held a hearing on the merits. The City asserts the consequences

of the ALJ's decision, which could involve requiring the City to reinstate all 110 respondents to their positions with a decade of back pay, are unduly severe.

We are satisfied the ALJ erred in concluding that the "effect" of the discovery sanctions he imposed should be the entry of a determination that the City's layoff action against respondents was not conducted in good faith under the relevant statutes and regulations.  N.J.A.C. 1:1-14.14 does not explicitly include rendering a decision on the merits of an action in favor of the party making a discovery motion among the permitted sanctions, and respondents did not request this remedy.  Further, the ALJ's action does not appear to be an "appropriate case-related action" under the circumstances.  Ibid.

As noted, the burden in this type of case is upon the employee to show that the employer laid him or her off in bad faith.  N.J.S.A. 11A:8-4; N.J.A.C. 4A:8-2.6(c).  The courts have long held that the power of a municipality to abolish a position or title or terminate an employee "cannot be questioned where such action is motivated by a bona fide desire to effect economies and increase municipal efficiency."  Greco v. Smith, 40 N.J. Super. 182, 189 (App. Div. 1956).  A presumption of good faith attends a municipal layoff action.  Ibid.

"The mere fact that the removal of an individual from the municipal payroll results in an economy is not the exclusive test," and a public employer

40

may not adopt a layoff plan simply "to effect the removal of a public employee, protected by civil service, without following the statutory procedure for removal." Greco, 40 N.J. Super. at 190. An affected employee may prove that his or her layoff, ostensibly based on economic reasons, was in bad faith if he or she demonstrates that those stated reasons were a pretext for an improper removal not truly related to economy or efficiency. Prosecutor's Detectives & Investigators Ass'n v. Hudson Cnty. Bd. of Chosen Freeholders, 130 N.J. Super. 30, 43 (App. Div. 1974).

However, if the presumption of good faith "is not overcome by sufficient proofs, it is of no consequence that there is proof showing that considerations other than economy underlay or played some part in that action." Schnipper v. N. Bergen Twp., 13 N.J. Super. 11, 15 (App. Div. 1951). Even if the motive for an employee's removal is tainted by improper considerations, the layoff will be upheld if his or her position was unnecessary and could be abolished without impairing departmental efficiency. Santucci v. Paterson, 113 N.J.L. 192 (Sup. Ct. 1934). Further, the court in Prosecutor's Detectives & Investigators Ass'n 130 N.J. Super. at 43, noted that discriminatory and other unfair and improper reasons for a layoff or other adverse employment action "most often surface[]

A-0066-18

in the form of action taken against an individual employee, rather than large groups of similarly situated persons" as occurred here.

The courts have also held that even where a defendant's answer is properly stricken for failure to make discovery, the plaintiff may be "precluded from recovery where the proof which he offers in support of his own case reveals a legal defense to his claim," Johnson v. Johnson, 92 N.J. Super. 457, 465 (App. Div. 1966), or "if her proofs reveal[] that she was not entitled to recovery." Kolczycki, 317 N.J. Super. at 517. For example, in Kolczycki, 317 N.J. Super. at 514-17, where the trial court struck the defendants' answer and defenses, this court nevertheless remanded the matter for a new hearing on the merits of the plaintiffs' complaint because there was a remaining question about whether the statute of limitations had passed before they filed their action.

By contrast, in Interchemical Corp. v. Uncas Printing & Finishing Co., 39 N.J. Super. 318, 321-23 (App. Div. 1956), where the defendant repeatedly failed to produce discovery despite the entry of court orders directing it to do so, this court found that the trial judge acted properly by not only suppressing the defendant's answer, but also ordering a default judgment against it and requiring the plaintiff to prove only its damages. We stated that the defendant had "invited" this sanction "by the course [that] it chose to pursue in the face of [the]

42

plaintiff's persistent efforts to get at necessary facts," and that the default judgment was "a just one, for the discovery proceedings went to the very foundation of [the] plaintiff's cause of action, and [the] defendant's refusal to comply was deliberate and contumacious." Id. at 324-26. The Supreme Court later cited Interchemical favorably when holding that the dismissal of the plaintiff's complaint in Abtrax Pharmaceuticals, 139 N.J. at 521-22, was proper, and stated that a litigant who "willfully violates [the] bedrock principle" of full disclosure of evidence during discovery "should not assume that the right to an adjudication on the merits of its claims will survive . . . ." Nevertheless, the case at hand is distinguishable, because while Rule 4:23-2(b)(3) explicitly permits the entry of a default judgment against a defendant who violates discovery orders in the Superior Court, N.J.A.C. 1:1-14.14 does not.

Here, the burden on respondents to prove that the City's layoffs were conducted in bad faith was a heavy one. The documentary evidence turned over by the City demonstrated the financial difficulties that Newark experienced at the time of the layoffs, that the City undertook appropriate alternative and pre-layoff actions, and that there were some discussions as to whether certain Departments could outsource services to private vendors or eliminate some services entirely. Cases like Schnipper and Santucci establish that an employee

43

cannot meet his or her burden even by showing that an employer's action was tainted by some inappropriate concerns so long as economy and efficiency were the main goals of the layoff. As a result, it may well be that even if respondents had received all requested discovery, they would not have been able to overcome the strong presumption that the City laid them off in good faith.

We conclude the ALJ erred by rendering a decision on the merits in respondents' favor as part of his determination on the discovery sanctions motion. The remedies for discovery violations in matters like this one do not explicitly include automatic entry of a decision in favor of the employee, respondents did not request such a remedy, the burden remained upon respondents to prove bad faith, and case law indicates that even where a defendant's answer and evidence have been stricken, a plaintiff is not necessarily entitled to recovery. Entitlement to the relief sought by plaintiff was not self-evident in this case. A proper conclusion on the merits could only be reached after factual findings were made and correlated to legal consequences.

We therefore hold that the ALJ, and thus the CSC, acted arbitrarily, capriciously, and unreasonably by finding in respondents' favor on the issue whether their layoffs were in good faith as part of the discovery decision. As a

44

result, we reverse this portion of the decision and remand for a hearing on the merits of respondents' claims of bad faith.

In sum, we affirm the portions of the decision finding that the City failed to comply with the ALJ's discovery orders and sanctioning the City by suppressing its briefs, defenses, and evidence, and reverse the portion entering a determination that the layoffs were conducted in bad faith, and remand for a hearing on the merits. Because the ALJ already rendered a determination on the merits in his Initial Decision, we direct that a different ALJ shall preside at the hearing on the merits.

Affirmed, in part, reversed and remanded, in part. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-0066-18